EXHIBIT B

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

venBIO SELECT ADVISOR LLC,          :
a Delaware limited liability        :
company,                            :
                                    :
            Plaintiff,              :
                                    :
      v                             :  Civil Action
                                    :  No. 2017-0108-JTL
DAVID M. GOLDENBERG, BRIAN A.       :
MARKISON, ROBERT FORRESTER,         :
JASON ARYEH, CYNTHIA L. SULLIVAN,   :
GEOFF COX, BOB OLIVER, and          :
SEATTLE GENETICS, INC.,             :
a Delaware corporation,             :
                                    :
            Defendants,             :
                                    :
      and                           :
                                    :
IMMUNOMEDICS, INC.,                 :
a Delaware corporation,             :
                                    :
            Nominal Defendant.:

                    - - -
            Chancery Courtroom 12B
            Leonard L. Williams Justice Center
            500 North King Street
            Wilmington, Delaware
            Thursday, March 9, 2017
            10:32 a.m.
                    - - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                    - - -

RULINGS OF THE COURT FROM ORAL ARGUMENT ON PLAINTIFF'S
        MOTION FOR TEMPORARY RESTRAINING ORDER

------------------------------------------------------
            CHANCERY COURT REPORTERS
        Leonard L. Williams Justice Center
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                (302) 255-0524

```
 1   APPEARANCES:

 2        DAVID J. TEKLITS, ESQ.
          KEVIN M. COEN, ESQ.
 3        ALEXANDRA M. CUMINGS, ESQ.
          Morris, Nichols, Arsht & Tunnell LLP
 4                 -and-
          MICHAEL E. SWARTZ, ESQ.
 5        KRISTIE M. BLASE, ESQ.
          of the New York Bar
 6        Schulte Roth & Zabel LLP
            for Plaintiff
 7
          JOHN L. REED, ESQ.
 8        ETHAN H. TOWNSEND, ESQ.
          HARRISON S. CARPENTER, ESQ.
 9        DERRICK FARRELL, ESQ.
          DLA Piper LLP (US)
10          for Director Defendants and Nominal Defendant

11        RAYMOND J. DiCAMILLO, ESQ.
          ANTHONY M. CALVANO, ESQ.
12        Richards, Layton & Finger, P.A.
                   -and-
13        BRIAN T. FRAWLEY, ESQ.
          ELIZABETH A. ROSE, ESQ.
14        of the New York Bar
          Sullivan & Cromwell LLP
15          for Defendant Seattle Genetics, Inc.

16                            -  -  -

17

18

19

20

21

22

23

24
```

3

1          THE COURT:  All right.  Welcome back,
2     everyone.  Please take your seats.
3               I want to thank you all again for your
4     presentations and for everyone for being here today.
5     In the interests of time and the exigencies presented,
6     I'm going to go ahead and give you my ruling now.
7               We're here on an application for a
8     temporary restraining order brought by venBio Select
9     Advisor against Goldenberg and other defendants.  I am
10    granting that application but only in part.  I'm doing
11    so primarily because the defendants took action to
12    waive a closing condition that eliminated a window for
13    postclosing review that I relied on when not
14    originally authorizing a full-blown expedited
15    proceeding when we were first together.
16              Pending a hearing on an application
17    for preliminary injunction, which I expect to happen
18    in approximately 30 days -- so give or take four
19    weeks -- the defendants are restrained from closing
20    the Seattle Genetics transaction.  As I hope is
21    apparent from what I just said, I am treating this as
22    a TRO application.  The defendants have argued
23    somewhat in passing that I should treat the
24    application as one for full-blown preliminary

1   injunctive relief.  But that is generally done only

2   when a party has had some opportunity for discovery.

3   In this case, there have been a series of procedural

4   situations that have combined to deny the plaintiffs

5   any opportunity for meaningful preapplication

6   discovery.  So I'm evaluating this under the TRO

7   standard.

8                  I'm now going to provide you with some

9   factual background.  This recitation is necessarily

10  preliminary and tentative.  It should not be taken as

11  anything approaching definitive findings of fact.  It

12  represents my view at this point, based upon the

13  limited record that I have, which, as I just noted, is

14  without the benefit of discovery.

15                 Defendant Immunomedics, which I will

16  call generally the Company, is a clinical drug

17  development manufacturer.  One of the Company's assets

18  is a developmental cancer drug that the parties refer

19  to as IMMU-132.  The story begins in 2015 when

20  IMMU-132 began generating promising results.  The

21  question was how the Company would undertake and

22  complete further trials and then bring a drug to

23  market.  This was a particularly significant question

24  for the Company because in its history, it has never

1  successfully brought a drug to market.

2             The defendants stress that in

3  December 2015 the Company's board started a process of

4  looking for drug development partners for IMMU-132.

5  It hired an outside advisor known as Torreya Partners

6  to find a drug development partner who would engage in

7  an outlicensing transaction with the Company.  There

8  are indications, preliminarily though they may be,

9  that the Torreya-led process proceeded at a leisurely

10 and ineffective pace.  Everyone appears to agree that

11 by summer 2016 the process had stalled.

12            During 2016 there also appears to have

13 been disagreements between the Company and some large

14 investors about how to pursue the drug development

15 process.  One of those large investors is the

16 plaintiff, venBio, which is a public market

17 investment fund focused on the biotechnology sector

18 with approximately 1 billion in assets under

19 management.  venBio is currently the Company's

20 largest stockholder, owning approximately 9.9 percent

21 of the common stock.

22            venBio contends that during 2016

23 Company management made a series of missteps that

24 significantly delayed the drug's development.  It is a

1  fact that during 2016 the Company's stock price fell

2  approximately 35 percent.  venBio asserts that it

3  engaged with Company management during this period and

4  made its concerns known, including its disagreements

5  with the Company's strategy.

6                    In September 2016, the board restarted

7  the process by hiring a new advisor, Greenhill &

8  Company.  Greenhill was charged with not only

9  considering an outlicensing transaction, but also

10  other strategic alternatives.

11                    At the time the Company planned to

12  hold its annual meeting on schedule on December 2016.

13  As matters existed in fall 2016, the annual meeting

14  did not figure prominently in the timeline for finding

15  a drug development partner.  That was because the

16  Company's directors expected to be reelected without

17  opposition at an uncontested meeting.  Under the

18  timeline that under consideration, the Company

19  expected to undergo a process that hopefully would

20  result in a transaction at some point in the first

21  quarter of 2017.

22                    The Company's plans went awry on

23  November 16, 2016, when venBio announced its intent

24  to nominate four directors for election at the annual

1   meeting.  It's worth noting that at the time the

2   company's board consisted of five seats, three of

3   which were filled.  Two were held by David Goldenberg

4   and his wife Cynthia Sullivan.  Goldenberg founded the

5   Company in 1982 and has served continuously since then

6   as the Chairman of the Board.  He's also currently the

7   Company's Chief Scientific Officer and Chief Patent

8   Officer.  Sullivan is the CEO and President.  venBio

9   alleges that they received significant financial

10  benefits and other consideration from the company.

11               The third seat was held by Brian

12  Markison, who appears to be an outsiders.

13               My impression is that the possibility

14  of losing control at the annual meeting prompted the

15  incumbent board to reassess its timeline and to take a

16  series of actions.  I'm satisfied at this preliminary

17  stage that those actions have to be viewed as reactive

18  to the contested proxy solicitation and, hence, with

19  the overlay of conflict that permeates those types of

20  decisions.  The authoritative discussion of those

21  conflicts remains the Aprahamian decision.

22               The board's first step was to postpone

23  the annual meeting until February 16th, 2017.  A small

24  stockholder, unaffiliated with venBio and

8

1    represented by a firm from the traditional plaintiffs'

2    bar, filed suit to challenge the postponement.  I

3    declined to schedule a challenge to the postponement.

4    I indicated at the time, and I continue to believe,

5    that the initial postponement was a reasonable step to

6    allow stockholders to receive information about and

7    make decisions regarding what had suddenly become a

8    contested situation.

9              The board then began doing more

10   significant things.  In December, the company expanded

11   Greenhill's role to include defending against

12   venBio's proxy contest.  The engagement letter

13   contemplated a contingent fee of $1.5 million, offset

14   by a monthly retainer of $150,000 per month.  That

15   engagement letter was entered into with the Company's

16   outside counsel, Vinson & Elkins, rather than with the

17   Company itself.

18             venBio had nominated four

19   individuals with significant business qualifications

20   and industry expertise.  So the next step for the

21   board on January 9, 2017, was to expand its size to

22   seven and add four new directors.  The four new

23   directors were themselves industry figures.  I think

24   it's readily inferable at this stage that the

1   incumbents recognized that a meaningful number of

2   stockholders were dissatisfied or at least concerned

3   about the leadership of a board dominated by the

4   founder and his wife and that by enlarging the board

5   and bringing on new directors, they sought to blunt

6   that campaign plank.  Expanding the board also meant

7   that venBio's nominees would constitute a board

8   majority, if elected, but they would be only a bare

9   majority and not the only people in the boardroom.

10                  In early February 2017, each proxy

11  advisory firm separately recommended that the

12  investors vote for venBio's full slate.

13                  On February 9, 2017, a preliminary

14  count of proxies submitted to date indicated that the

15  incumbent directors would lose the election and that

16  venBio's nominees would win and take control.  That

17  evening the incumbent board did four things.  First,

18  they cut short the ongoing strategic process and

19  entered into a development and license agreement with

20  Seattle Genetics.  At the time, the process was still

21  active, with 12 potential counterparties exploring a

22  deal with the Company and at various stages of

23  involvement.  Second, they postponed the annual

24  meeting from February 16th until March 3rd.  Third,

1    they amended the Company's bylaws to change the rules

2    for the voting process such that directors would be

3    elected by plurality rather than a majority of votes.

4    Fourth, they amended the bylaws to provide for

5    mandatory advancement, and they entered into

6    indemnification agreements with the incumbent board

7    members.

8                    The Company announced the licensing

9    deal and the second postponement of the annual meeting

10   on February 10th.  The bylaw amendments were not

11   disclosed until February 16.

12                   The licensing deal is, by any measure,

13   a transformational transaction for the company.  It

14   is, I think, facially dubious in such a situation to

15   cut short an active process involving multiple

16   suitors, and I think it is not coincidental that that

17   occurred on the same day that the preliminary count of

18   proxies indicated that the vote was running against

19   the incumbents.  At least at this stage of the case, I

20   am not willing to accept that that was mere

21   happenstance.

22                   I really am not in a position to

23   express any meaningful view on whether the licensing

24   deal is a good transaction for the company or not.

1   The amount of the consideration is certainly facially

2   large, and the defendants have harped on that fact.

3   venBio has responded, however, that this has to be

4   looked at on a relative basis, which I think is quite

5   logical, and that the economics are poor for a

6   licensing deal involving a potential blockbuster drug

7   candidate like IMMU-132.  venBio has relied for this

8   proposition on the views of an expert firm.  One

9   example is that they contend that 63 percent of the

10  value from the transaction is captured in the royalty

11  streams but that the royalty rates for the deal are

12  approximately 50 percent lower than market.

13              The defendants have come back with

14  further analysis from Greenhill, but at this point

15  I'm, frankly, inclined to discount Greenhill's views

16  because of their dual role and their

17  multimillion-dollar incentives to favor a transaction

18  as part of their two engagements for the Company.

19              As with the appointment of the outside

20  directors in January 2017, it seems to me at this

21  preliminary stage that the signing up of the deal was

22  likely an effort to take away what would have been

23  venBio's major election plank.  venBio had

24  criticized management for how it was handling the drug

1   development process and whether it had the ability to

2   take control and carry out that task.  By signing up

3   the licensing deal and then postponing the meeting,

4   the incumbent board could claim that they had

5   responded to those criticisms and eliminated the need

6   for new directors to come in and do what the

7   incumbents had already done.

8              What is particularly important for

9   present purposes is that all this happened just six

10   days before the stockholders would decide on the

11   composition of the board that they wanted to determine

12   the Company's future.  Under the circumstances, given

13   this constellation of facts, I think it is readily

14   inferable, and particularly inferable for purposes of

15   a temporary restraining order, that the defendants

16   acted, at least in part, for the purpose of affecting

17   the election contest and because they believed that

18   they knew better than the stockholders who should

19   determine the future path of the Company and what it

20   should be.

21              The announcement of the licensing deal

22   prompted venBio to file suit.  Among the relief

23   venBio sought was an order maintaining the status quo

24   by enjoining the Company from postponing the annual

1   meeting for a third time or changing the meeting's

2   record date.  They also sought an order preventing the

3   closing of the Seattle Genetics transaction until

4   after the election of a new board.  In response, the

5   Company made the following representations.  I'm going

6   to quote.  "As to the annual meeting itself,

7   Immunomedics agrees to hold the annual meeting of

8   stockholders on March 3rd, 2017; agrees not to

9   postpone, adjourn, or otherwise delay it without Court

10  approval, and agrees it will not change the record

11  date, thus mooting Count IV of the complaint."

12              On the morning of February 16th I held

13  a telephonic conference.  Based on the defendants'

14  representations, I determined that there was no need

15  for a hearing on venBio's request for immediate

16  injunctive relief, but I ordered the defendants to

17  produce the licensing agreement, as well as relevant

18  board minutes and board mentions so that venBio

19  could assess the matter and figure out whether,

20  notwithstanding the Company's representation, some

21  type of immediate relief was needed.

22              That prompted a renewed conference

23  with the parties on February 17th.  This conference

24  was to address the possibility that the Seattle

1   Genetics transaction might close before the annual

2   meeting.  During the teleconference, the defendants

3   represented that they would not close until March 8th,

4   which was after the annual meeting.  venBio noted

5   that after the election, there would be no need for

6   emergency relief because Section 14.1(ii) of the

7   license agreement provided that the absence of

8   litigation was a condition to closing.  Consequently,

9   in the event that venBio's slate won the election,

10  as they were then anticipating, the new board could

11  determine not to close until the litigation was

12  resolved.

13                  I went through various hypotheticals

14  as to what might happen under certain circumstances

15  and whether we would really need a hearing and when we

16  wouldn't.  And all of these scenarios took into

17  account the existence of the closing condition as a

18  protection against the need for an imminent hearing.

19  No one from the defense side took issue with the

20  various sequences that I was contemplating.

21                  Hours later, the Company filed suit in

22  the United States District Court for the District of

23  Delaware seeking a declaration from the federal court

24  that it was entitled to reset the date for determining

1  the stockholders of record eligible to vote at the

2  annual meeting.  And the Company asked the federal

3  court to issue injunctive relief.  They wanted an

4  injunction that "requires venBio to either (i)

5  withdraw its request made in the Chancery Court action

6  for Immunomedics' annual meeting to take place on

7  March 3rd, 2017 or (ii) stipulate in this action to

8  Immunomedics' right to move the date of the annual

9  meeting to a date at least 30 days after venBio has

10 made the corrective disclosures."

11             The defendants stressed to the

12 District Court, and have argued to me, that they filed

13 this action because they believed that the federal

14 claims had to be heard in federal court.  That is

15 somewhat inconsistent with the fact that they've now

16 filed a 225 action that seeks to litigate similar

17 claims in this court.

18             They've also stressed that after

19 filing suit, they sent me a copy.  Particularly in

20 front of the federal court, they took solace in the

21 fact that I didn't haul them in after receiving it.  I

22 don't know why I would have done that.  Under the

23 Supremacy Clause, a federal court outranks me.  I

24 don't go around telling federal judges what to do,

1   particularly about matters of federal law.  Not only

2   that, but it's particularly true when it's Judge Len

3   Stark, whom I've known for years.  Frankly, if I had a

4   choice as a litigator between Judge Stark and me, I'd

5   pick Judge Stark.  So I wasn't about to try to corral

6   you-all in here and take you away from the benefits of

7   Judge Stark's learning.  So I decided to wait and see

8   what would happen.

9          What happened is that on February 20,

10  2017, without providing any prior notice to the

11  plaintiff or the Court, the Company agreed to amend

12  the license agreement to waive the closing condition,

13  apparently for no consideration.  The existence of

14  that condition is what we had discussed during the

15  hearing on February 17th as the reason why a

16  full-blown expedited premeeting proceeding was not

17  necessary.

18         On March 2nd, 2017, following briefing

19  and over two hours of oral argument, Judge Stark

20  declined to grant any injunctive relief.  He found

21  that the Company had failed to make out any of the

22  elements of the injunction standard, including failing

23  to establish a reasonable probability of success on

24  the merits of its claims.

1            On March 3rd the Company's stockholder

2    voted to elect venBio's four nominees.  They were

3    the only director candidates who received a majority

4    of the votes.

5            The defeated members of the incumbent

6    board have subsequently filed suit under Section 225

7    of the DGCL to challenge the results of the election.

8    They've asked for a status quo order that would permit

9    them to remain in office until the final resolution of

10   the claims that they brought in federal court and have

11   recharacterized in state court and which the federal

12   court has already said have no reasonable probability

13   of success.

14           The status quo order is not before me

15   today, but I will comment on it at the end of this

16   ruling.

17           venBio then filed an amended

18   complaint and pursued this TRO application.  They seek

19   a series of relief, including an order "(i) directing

20   that the Inspector of Elections certify the results of

21   the election of directors based upon the votes at the

22   annual meeting immediately following the annual

23   meeting; (ii) enjoining defendants, their agents, and

24   all persons acting in concert with them from taking

1    any further action to impede or interfere with

2    venBio's nominees being seated as the validly elected

3    board, and compelling defendants to recognize and

4    abide by the result of the election of directors at

5    the annual meeting, including certifying the results

6    and taking all actions necessary to seat the

7    rightfully elected directors; (iii) enjoining

8    defendants from continuing to act or purport to act as

9    directors of the Company, including expending any

10   funds or otherwise utilizing the Company's assets

11   without the approval of the rightfully elected board;

12   (iv) declaring the plurality bylaw amendment invalid;

13   and (v) enjoining defendants, their agents and

14   representatives and all other persons acting in

15   concert with them from taking any actions in

16   furtherance of closing the Seattle Genetics

17   transaction until further order of this Court."

18                The bulk of this relief is not

19   suitable for consideration on the present record or

20   within the framework of a TRO application.  I will not

21   enter a TRO directing the Inspector of Election to

22   certify the results.  I also will not enter a TRO

23   compelling the defendants to recognize and abide by

24   the results of the election of directors at the annual

meeting.  Both are forms of mandatory relief.  That

would require the equivalent of a summary judgment

record before they could be granted.

I also won't enter an order in this

action enjoining the defendants, their agents and

persons acting in concert with them from impeding or

interfering with venBio's nominees being seated as

the validly elected board, or enjoining the defendants

from continuing to act or purport to act as directors

of the Company, et cetera.  These forms of relief are

prohibitive, but I think they're best addressed

initially through the status quo order in the Section

225 action and later through a grant of final relief

in that action.

I have considered entering a TRO that

would enjoin the effectiveness of the plurality bylaw

amendment.  That amendment changed the rules for the

vote in the midst of the election contest because

without that amendment, a director who didn't receive

more than a majority vote would be a holdover

director.  And as venBio points out, the Company

could hold a new meeting to fill their seats.  With

the amendment, a director who does not receive a

majority vote is, nevertheless, a validly elected

1    director who is entitled to serve out a term unless

2    earlier removed.  But I don't think the plurality

3    bylaw meaningfully affects the application today, and

4    I think its interim utility is best addressed in the

5    status quo order and ultimately in the 225 action.

6                    So this leaves the application to

7    enjoin the defendants, their agents, representatives,

8    and people acting in concert with them from taking any

9    action to close the Seattle Genetics transaction.  As

10   I said at the outset, that relief I am granting

11   pending a preliminary injunction hearing.

12                   To obtain a TRO, the moving party must

13   demonstrate a colorable claim, a threat of irreparable

14   harm, and, as always, show that the balancing of the

15   hardships favors equitable relief.  I personally

16   continue to regard Cottle v Carr as the authoritative

17   statement of that standard, although everyone in this

18   case seems to like more recent decisions.

19                   venBio has stated a colorable claim

20   that the terms of the licensing deal are subject to

21   intermediate scrutiny because the board entered into

22   the transaction during an active proxy contest with

23   defeat looming, with the goal of taking an issue away

24   from the insurgents by locking down the asset the

1   insurgents were running to control and taking away one

2   of their election planks.

3                    Aprahamian and Mercier teach that when

4   incumbent directors act to affect the outcome of a

5   proxy contest, they act against a specter of

6   self-interest.  This self-interest is not so strong as

7   to warrant the triggering of entire fairness review,

8   but it is also not so weak as to comfortably allow

9   business judgment review.

10                    venBio has stated a colorable claim

11  that the directors' self-interest in prevailing in the

12  proxy contest tainted their decision to enter into the

13  licensing agreement and resulted in terms that were,

14  at a minimum, suboptimal for the Company and its

15  stockholders in light of their self-interest.  They

16  have provided expert analysis indicating that the

17  terms of the agreement, while facially large, are less

18  than what a nonconflicted negotiator could have

19  achieved.  They also have called into question the

20  incentives of Greenhill by outlining its doubly

21  contingent fee structure.

22                    It is true that the license agreement

23  is not a blatant and obvious attempt to interfere with

24  the stockholder vote by issuing voting shares,

1  changing a vote standard, or taking other action that

2  directly affects the rules of the election.  The

3  plurality amendment was that, but the licensing deal

4  was not that.  The licensing deal was more subtle.

5  But subtlety does not take conduct beyond the realm of

6  equity.  That is precisely where the flexibility of a

7  court of equity is needed.

8          When I look at the totality of the

9  circumstances here, I think it is colorable the

10 defendants entered into the license agreement when

11 they did, on the day they found out the vote was going

12 against them, thereby cutting short an active process,

13 because of the specter of self-interest and in an

14 effort to win an election that they knew they were

15 losing.  I also take into account they did other

16 things contemporaneously, such as changing the rules

17 by adopting the plurality bylaw and adopting other

18 personally beneficial provisions such as the

19 advancement bylaw and the indemnification agreements.

20 I'm also influenced by subsequent behavior such as the

21 waiver of the litigation condition.

22          In response to this, the defendants

23 have advanced some formulaic and simplistic arguments.

24 They first assert that because entrenchment cases are

1    generally derivative, this case has to be analyzed as

2    a derivative case and subject to Aronson for purposes

3    of demand futility.  But this is an entrenchment

4    allegation in the context of an active voting contest

5    where it is certainly colorable that the directors

6    took the action they did to interfere with how the

7    stockholders would vote.  So, in my view, it is

8    colorably direct and, in any event, subject to review

9    under enhanced scrutiny.

10                   The defendants' formulaic argument

11   about the derivative nature of the claim is one of the

12   examples of attempting to legalize, i.e., make subject

13   to legal rules and, hence, ossify a mechanism, a

14   flexible mechanism, that developed in equity.  That's

15   the derivative action.  I don't think the derivative

16   action is so cabined.  I also recall that the Chief

17   Justice, while a member of this Court, wrote in

18   Gaylord that even if Unocal claims are derivative,

19   that fact, i.e., enhanced scrutiny, would defeat a

20   Rule 23.1 motion.  I would think the same reasons

21   would apply all the more so when you're talking about

22   a claim involving the stockholder vote.

23                   Building on their Aronson argument,

24   the defendants seem to think that only direct

1   self-interest is sufficient to taint the license

2   agreement, and they stress that no conflict rising to

3   that level exists.  They also seem to think that

4   defendants must be shown to have consciously sought to

5   interfere with the election.  I don't think either is

6   true.  I think the strength of the enhanced scrutiny

7   analysis in these types of situations that give rise

8   to structural conflicts like the election issue is it

9   allows a court to act in the absence of evidence of

10  direct interest or scienter.  Certainly that's helpful

11  if it is there, but it's not required.

12              Most simplistically, the defendants

13  have made a series of timing arguments based on the

14  idea that the search for a development partner began

15  in December 2015 and that Greenhill was hired in

16  September 2016.  According to the defendants, this

17  means that the board can't possibly have acted for

18  entrenchment because venBio had not emerged when the

19  board did these things.  Now, in fairness, Mr. Reed

20  backed away from that this morning and was a little

21  more subtle and nuanced in recognizing that what

22  venBio's arguing is that at the end of the process

23  they accelerated and entered into the suboptimal

24  agreement.  But the briefs took this very strict idea

1  that because the process started before, it was

2  incomprehensible that anything could have been

3  affected by venBio.

4          So it's true venBio's theory is

5  straightforward, but it's not nearly so simplistic.

6  Their point is that the board accelerated its path and

7  rushed the final steps of the process during the

8  December through February time frame after the proxy

9  contest launched.  In other words, even if the process

10  started earlier, it was moving ineffectively, it

11  seems, under the Torreya regime, and then really

12  hadn't gotten started in September under the Greenhill

13  regime, but then when venBio emerged, things really

14  started to press.  And particularly when the vote

15  tally came out, that's when the incumbents cut short

16  the process, entered into an agreement, and attempted

17  to take a plank away from the insurgents.  That's all

18  stuff that happens after venBio emerges in response

19  to venBio.

20          Now, I want to reiterate at this point

21  that this is a temporary restraining order and these

22  are preliminary assessments on my part.  So Mr. Reed

23  argued this morning that the defendants acted in good

24  faith because they truly believe that the transaction

1 is in the best interests of the Company, and he

2 pointed to factors that support that.  They may well

3 have done that.  Nobody should hear me as making a

4 definitive holding that these folks acted for an

5 improper purpose or that this is the final ruling in

6 this case.  We are here on a temporary restraining

7 order.  And so the question is what do we do now at

8 this preliminary stage when it's impossible to do

9 full-blown final fact-finding?  My point and my view

10 is that the plaintiffs have come forward with enough

11 at this stage and that it is colorable, even somewhat

12 more than colorable, that this is what happened.  But

13 once the evidence comes in and people get discovery,

14 something else may certainly prove to be the case.  I

15 think it will be particularly interesting to know what

16 these folks actually were told about the effect of the

17 license agreement on the vote.

18 And in that regard, I think that's now

19 at issue.  I think the arguments that Mr. Reed made

20 this morning are nice, they're interesting.  But what

21 they put at issue is what the board actually was told.

22 And, frankly, what I don't want to hear is that

23 because Vinson & Elkins retained Greenhill, all of a

24 sudden Greenhill became an agent of Vinson & Elkins

1  for purposes of the attorney-client privilege so that

2  no one can get discovery into what the board was told

3  about the vote.  Let's just nip that in the bud right

4  now.

5          So the defendants have also relied, in

6  terms of their bona fides, on the six-day go-shop and

7  say that this validates the deal.  At this preliminary

8  stage, call me skeptical.  Six days.  That is

9  incredibly short.  And it's a context where it is

10  conceded no one does go-shops in this industry.  So

11  it's not like people would be revved up and have a

12  playbook to come in on a go-shop in this six-day

13  window.  At present, I don't think the logical

14  inference is necessarily that the Seattle Genetics'

15  offer was a blow-out bid.  Maybe it was.  It's

16  described as such without citation in the papers.  I

17  guess it is with citation to the affidavit, but I

18  don't know that's the case.

19          I think it is equally likely that

20  Seattle Genetics was an incumbent trade bidder with a

21  match right that gave it the equivalent of a right of

22  first refusal; that other market participants looked

23  at this and said "Six days, against somebody that's

24  got a unique source of value, can match whatever we

do, and we come into a litigation?  Why would I top on
that?"  It seems to me preliminarily that the other
market participants in this process would not see a
reasonable path to success within the six-day period,
particularly when go-shops are uncommon in this space.
So at least preliminarily, I don't think the absence
of a topping bid has any implications for the pricing
of the Seattle Genetics deal, and it's just too
complex for me to wade into otherwise.

So for all these long-winded reasons,
I think that there is a colorable claim challenging
the Seattle Genetics deal.

Let's now turn to irreparable harm,
which is the sine qua non of a TRO.  In this case, I'm
heavily influenced by two things.  First, this is a
highly complex transaction.  It has lots of moving
parts that depend on a lot of different future
contingencies.  This is not something where you're
looking at a merger price and comparing it to valuing
a Company, which, admittedly, is a hard thing to do,
but at least you have a more set timeline.  This
involves multiple revenue streams that depend on the
outcome of multiple future paths.  I think it will be
very difficult to construct some type of damages

1    remedy after the fact.  Is it possible?  Yeah, I'm

2    sure it's possible.  You guys can find really smart

3    experts.  But is it preferable?  No.  Is it highly

4    difficult?  Absolutely.

5                    Second, I'm influenced by the fact

6    that when we were previously together, I did not order

7    full-blown expedited proceedings because I thought the

8    litigation condition would allow the venBio

9    nominees, if elected, to examine the transaction to

10   determine what to do.  The defendants then took

11   matters into their own hands by waiving the litigation

12   condition and changing the landscape on which the

13   Court had originally acted.  And this is a material

14   difference because, as Mr. Teklits points out, with

15   the condition in place, the decision not to close did

16   not necessarily give rise immediately to breach.

17   There was a condition with the objective fact of

18   existing litigation that the venBio nominees, the

19   new board members, could point to when declining to

20   close.  Now they're in a very different situation, at

21   least as far as the condition goes.  So this is a

22   landscape changer, and it was done for a recitation of

23   good and valuable consideration, but not actually any

24   evidence of good and valuable consideration, in the

1    midst of active litigation over precisely that issue.

2              So under the circumstances, I believe

3    a sufficient threat of irreparable harm exists to

4    warrant a temporary restraining order blocking the

5    transaction from closing until we can have a

6    preliminary injunction hearing approximately 30 days

7    from now.

8              Although not directly relevant to this

9    application, the licensing agreement itself

10   contemplates both injunctive relief and equitable

11   relief.  Those are in Sections 15.5 and 16.2(i).

12   Obviously those are for contract parties, not for the

13   type of application we're talking about here today,

14   but the fact that the parties themselves would opt out

15   of a strict damages remedy and specifically stress the

16   availability of injunctive relief I think supports the

17   entry of the injunction here.

18             Finally, there's the balancing of

19   hardships.  The overarching issue is that a deal for

20   IMMU-132 is a unique opportunity for the Company.

21   It's transformational.  So, on the one hand, this is a

22   unique opportunity for the new nominees to evaluate

23   that deal and decide what to do.  That favors

24   injunctive relief to restore the situation that would

1   have existed had the litigation condition not been

2   waived.  Against that is the fact that the agreement's

3   not going away.  There's no drop-dead date.  The

4   litigation condition would have enabled the venBio

5   nominees to do exactly what they want to do had it not

6   been waived.  So in terms of the parties, it strikes

7   me that the balancing of hardship favors the

8   plaintiffs.

9             Then there's this, frankly, offensive

10  assertion that if I grant a TRO, I will have blood on

11  my hands because it will cost people's lives.  I am

12  very sensitive to the fact that this is an important

13  drug that is helpful to people, and I, of course, have

14  no desire to cause anyone harm.  But where was that

15  imminent concern about deaths when the Torreya folks

16  were walking through the process months ago?  And

17  where was that concern in September when Greenhill got

18  hired with the idea was that they'd start up in

19  November?  Do not put this on me.  Do not tell me that

20  thousands of people will die if I grant this TRO.  Do

21  not tell me today that lives are at stake.

22            Not to mention, this is not a drug

23  that is going to market tomorrow.  This is a drug that

24  still has to get approval, still has to go through

1  trials.  We're still looking at probably a year-long

2  path before it gets anywhere.  We're looking at

3  something where regulatory developments could shorten

4  that path or lengthen that path.  So to come in and

5  essentially say "Court, you will have blood on your

6  hands if you grant this TRO," it's not something I

7  take kindly to.

8              Given my ruling, I don't think I need

9  to reach the 271 argument, and I'm not going to.

10              Now the question is bond.  The

11  up-front consideration in the deal is $250 million in

12  cash.  Consistent with their simplistic approach to

13  other issues, the defendants have boldly asked for a

14  bond equal to that full amount.  That is indeed

15  simplistic and also disproportionate because we're not

16  talking about losing the entire deal forever.  What

17  we're talking is a short delay, and so what we're

18  talking about is the time value of money of the

19  benefits of the deal.

20              So if we use $250 million as the proxy

21  for the immediate benefits the deal, which is what

22  the defendants are proposing, what we're really

23  talking about is the lost time value and increased

24  risk of losing that value.  That is a fraction of

1    $250 million.  Now, nobody's taken that realistic

2    approach.  The plaintiffs have been equally simplistic

3    and just said "Hey, let's go nominal."

4              So I want to pull some rough numbers

5    out of the air.

6              If I think that the $250 million, the

7    time value of that and risk value of that is something

8    like 10 percent, 15 percent on an annualized basis, I

9    would dial that back down for a month, which is what

10   we're talking about between now and a PI.  So at

11   $25 million to maybe $35 million for one year, you're

12   looking at maybe $2 to $3 million over one month.  I'm

13   not being exact in these numbers because this is not

14   an exact science.

15             Now I'll put our another data point,

16   and that's the cost of a P.I., because what I'm trying

17   to do is to protect the defendants against the ability

18   to recover costs if they are wrongfully enjoined.  We

19   have high-priced legal talent here.  So I will roughly

20   estimate that the cost of a preliminary injunction

21   over the next four weeks is probably going to be about

22   a million bucks.  Could be low, but that's what I'm

23   going to use.

24             So given all that, I'm going to set

1   the bond at $1 million.

2          Now, I've made a couple references

3   during this lengthy oral ruling to the 225 action and

4   the status quo.  Here's what I am highly inclined to

5   do in that, recognizing that I've only got the one

6   side's proposed form of order.  But I think in this

7   context I'm taking into account the fact that, one,

8   the venBio nominees have been elected.  In other

9   words, they have majority stockholder votes in their

10  favor.  Two, Judge Stark has already determined that

11  the bases for contesting that, at least at a

12  preliminary stage, did not have a reasonable

13  likelihood of success.  Therefore, what I am going to

14  do in terms of status quo order is to treat the

15  venBio nominees and the three directors whose seats

16  are contested based on the validity of the plurality

17  bylaw as the status quo board pending the outcome of

18  that action.

19          The status quo order that I would like

20  you-all to agree on should limit this new board to

21  conduct in the ordinary course of business absent

22  consent or an application for good cause shown.  What

23  I want carved out of that status quo order is anything

24  relating to Seattle Genetics.  In other words, the

35

1   Seattle Genetics deal, where I have now put a TRO in

2   place, should be handled in this proceeding, this

3   case.  This case is for Seattle Genetics.  The TRO

4   order in this case is going to govern the Seattle

5   Genetics deal.  If we get a preliminary injunction

6   going forward, that will govern the Seattle Genetics

7   deal.

8               As for the 225 action, as I say, my

9   strong inclination is to have the postmeeting board

10  for the status quo order be the four venBio folks

11  and the three others, and then people can litigate to

12  their heart's content what happens with this plurality

13  bylaw.

14              I will also tell you that I am not

15  inclined to deal with the 13D matters in this Court.

16  This side of the room, you-all chose your forum, and

17  you went federal.  You said federal was the right

18  place to hear that.  Enjoy it.  Judge Stark's a great

19  judge.  As I said, I'd rather be in front of him than

20  me.

21              So the other things I'm happy to deal

22  with here, but that's my inclination.  Now, if, with

23  that guidance, you-all can agree to something, that's

24  great.  We can avoid another hearing.  If you can't

agree to something or if there's something that you

believe is just so tremendously unjust about this or

contrary to law that you want a different status quo

outcome, fine.  Put in your papers.  We'll get

together promptly.  We'll have a hearing.  But at

least in terms of those things, that's what I think

should happen in the 225 action and will hopefully

help move things forward there.

All right.  I have now talked for 50

minutes.  You-all have been very kind in listening to

me.  I want to now ask for questions, recognizing that

it may have been too much to take in all in one go in

terms of having questions.

Mr. Teklits, it was your motion.  I

always start with the movant.  What questions do you

have in terms of anything that I can clarify?

MR. TEKLITS:  I think we want to go

back and consider this.  What I can see the issues are

going to arise is in the status quo order under 225

because -- I'm not sure it came through, but this is a

Company that's going to be in need of financing.

There's going to be important decisions that may have

to be made over the next month.  And I'm not sure

we're going to be able to agree on a mechanism for

37

1   those to be made.  So I don't think we can address

2   them today but --

3                    THE COURT:  Okay.

4                    MR. TEKLITS:   -- I'm just warning

5   Your Honor that that is likely to be in front of Your

6   Honor.

7                    THE COURT:  That's a good heads up.

8   And, look, as with anything, the status quo order is

9   designed to set the initial framework and then, you

10  know, you can apply to depart from that.  Like, let's

11  say you got a financing transaction.  You can come in

12  and say "We've got good cause to do it" or something

13  like that.  But we can take that up if we need to.

14                   Any other questions from your side?

15                   MR. TEKLITS:  Oh, I assume we're just

16  going to schedule the PI hearing with Your Honor's

17  assistant.

18                   THE COURT:  Yeah.  Why don't you-all

19  work -- that's a good point.  I mean, do your normal

20  good Delaware thing.  Get me a schedule.  Don't let

21  these forwarding guys go all nuts on you.  Get a good,

22  reasonable schedule.  I've got another case right now

23  where the forwarding counsel are going crazy.  I need

24  to get the Delaware folks back in the driver's seat.

38

1    I want your hands on the wheel.

2                   MR. TEKLITS:  Understood, Your Honor.

3    That's all.

4                   THE COURT:  Mr. Reed, questions from

5    your side?

6                   MR. REED:  I don't.  I heard

7    everything Your Honor said.  I am going to go back.

8    I'm going to look at the draft paper that's on my desk

9    and see whether there's anything in it that warrants

10   putting it in front of Your Honor on the status quo

11   preliminary determination that Your Honor made.  And

12   if I think there isn't, we'll work something out.

13                  THE COURT:  Great.  Thank you.

14                  Mr. Frawley.

15                  MR. FRAWLEY:  Thank you, Your Honor.

16   Nothing for Seattle Genetics.

17                  THE COURT:  All right, great.  Well,

18   thank you, everyone, for your time today, for your

19   presentations, and most of all for listening to me for

20   the past 50 minutes.  I hope everyone has a good rest

21   of the day.

22                  We stand in recess.

23              (Court adjourned at 12:41 p.m.)

24                       -  -  -

39

CERTIFICATE

I, NEITH D. ECKER, Chief Realtime Court Reporter for the Court of Chancery of the State of Delaware, Registered Diplomate Reporter, Certified Realtime Reporter, and Delaware Notary Public, do hereby certify that the foregoing pages numbered 3 through 38 contain a true and correct transcription of the rulings as stenographically reported by me at the hearing in the above cause before the Vice Chancellor of the State of Delaware, on the date therein indicated, which were revised by the Vice Chancellor.

IN WITNESS WHEREOF I have hereunto set my hand at Wilmington, this 9th day of March 2017.

/s/ Neith D. Ecker
_____
Chief Realtime Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
Delaware Notary Public

CHANCERY COURT REPORTERS